UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Lockport Redevelopment LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  21 cv 6251 |
| | ) | |
| Fifth Third Bank, National Association, | ) | Jury Demanded |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Lockport Redevelopment LLC, by its attorney, Glenn E. Heilizer, for its complaint against defendant, Fifth Third Bank, National Association, states as follows.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Lockport Redevelopment LLC is an Illinois limited liability company with its principal place of business in Cicero, Illinois.  All members of Lockport Redevelopment, LLC are citizens of Illinois.  Plaintiff is a citizen of Illinois within the meaning of 28 U.S.C. § 1332.

2.      Defendant Fifth Third Bank, National Association is a bank regulated by the Federal Deposit Insurance Corporation.  Its main office is located in Cincinnati, Ohio. Defendant is a citizen of the State of Ohio, within the meaning of 28 U.S.C. § 1332 and 28 U.S.C. § 1348.

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, a substantial part of the events and omissions giving rise to this claim occurred within this District.

## FACTS

5.     At all times material to this lawsuit Fifth Third Bank has owned a building and land parcel located at 16732 W. 159th Street, Lockport, Illinois, and has operated a banking facility with one or more exterior ATM machine at that location with drive-through access.

6.     On September 2, 2021, Fifth Third Bank entered into a purchase and sale agreement to sell the Lockport property to Lockport Redevelopment, for $655,000.  A true and correct copy of the purchase and sale agreement is attached as Exhibit A.

7.     Lockport Redevelopment paid a non-refundable deposit of $100,000 following the execution of the purchase and sale agreement.

8.     During the negotiation of the purchase and sale agreement, Fifth Third Bank specifically negotiated for the right to lease back of a portion of the property from Lockport Redevelopment following the sale, and attached the draft lease to the purchase and sale agreement.  The portion of the property subject to the leaseback provision was one of the drive-through ATM machines.  Fifth Third Bank requested to lease the ATM drive-through facility for a period of two years, for a monthly rent of $250, and additionally to maintain signage pertaining to the ATM.

9.     Lockport Redevelopment agreed to include Fifth Third Bank's ATM lease-back request in the purchase and sale agreement.  In evaluating the lease-back, Lockport Redevelopment determined that, in addition to providing a monthly rental figure of $250, the ATM drive-through significantly increased the overall value of the asset.

10.     Thus, when Lockport Redevelopment accepted Fifth Third Bank's demand to lease back the drive-through ATM, the lease-back not only became a right that Fifth Third Bank possessed, but also became a valuable component of the transaction for Lockport Redevelopment.

11.     The purchase and sale agreement prescribed a post-execution "inspection period," during which Fifth Third Bank was required to supply Lockport Redevelopment with certain "due diligence" materials regarding the property, and further was required to make the property available for inspection, to enable Lockport Redevelopment to evaluate the property's suitability for purchase.  Prior to the expiration for the inspection period, Lockport Redevelopment was entitled to terminate the purchase and sale agreement in its discretion.  In the event Lockport Redevelopment failed to terminate the purchase and sale agreement before the inspection period expired, Lockport Redevelopment's right to terminate the purchase and sale agreement on this ground was waived.

12.     Although Fifth Third Bank provided certain due diligence materials regarding the property to Lockport Redevelopment during the inspection period, the bank failed to supply other materials, such as (1) the latest annual fire sprinkler and backflow test; (2) real estate tax bills; (3) utility bills; (4) contracts for garbage removal, landscaping and snowplowing; (5) servicing records for landscaping sprinkler system; (6) records relating to any roof repairs; and (7) property management reports from the bank's property management agent. Consequently, Lockport Redevelopment requested that the bank provide the above missing due diligence items.  Fifth Third Bank agreed to this request, and further agreed to extend the due diligence period to allow for the additional a production.  A true and correct copy of the extension agreement is attached as Exhibit B.

13.    Subsequently, Fifth Third Bank made an additional production of due diligence materials to Lockport Redevelopment.  Although the bank failed to produce documents regarding each category identified by Lockport Redevelopment, the bank's attorney stated "attached is everything 5/3 has in their files."

14.    Pursuant to the purchase and sale agreement, as amended, the closing of the transaction was required to occur by November 17, 2021.

15.    Shortly before the November 17, 2021 closing date, Lockport Redevelopment learned that, contrary to Fifth Third Bank's statement that it did not have any property management reports from the bank's property management agent, in fact the reports did exist.  These reports were highly material to Lockport Redevelopment's evaluation of the Lockport property.

16.    Additionally, Lockport Redevelopment discovered shortly before the November 17 closing date that Fifth Third Bank's leaseback provision was not lawful under applicable zoning regulations.  Specifically, Fifth Third Bank under current zoning was allowed to operate a drive-through ATM facility as long as it operated a financial institution in the adjacent building at the site.  Once Fifth Third Bank sold the property to Lockport Redevelopment, however, and no longer operated a financial institution in the adjacent building, zoning regulations required that a special use permit be obtained for any drive-through ATM. Lockport Redevelopment was unable to locate any special use permit for the Lockport property.

17.    By withholding due diligence documents and falsely stating it did not have them, Fifth Third Bank committed a default under the purchase and sale agreement.

18.    By requiring Lockport Redevelopment to agree to a lease of the ATM that would violate applicable zoning regulations, Fifth Third Bank committed a default under the

purchase and sale agreement.

19.     Lockport Redevelopment promptly notified Fifth Third Bank of its defaults under the purchase and sale agreement, and requested that the bank (1) provide the missing property management reports and (2) rectify the zoning issue with the leased-back ATM so that the transaction could close.

20.     Fifth Third Bank refused to provide the property management reports, stating it was entitled to falsely state it did not have them because its agreement to provide the documents "was just a courtesy and not a contractual obligation."

21.     Further, although Fifth Third Bank attempted to resolve the zoning problem presented by the ATM lease-back, by offering to withdraw the ATM lease and giving Lockport Redevelopment a credit for the total unpaid rent amount at closing, or alternatively by signing the lease without operating the ATM, those alternatives did not fully compensate Lockport Redevelopment for the loss of the valuable ATM lease as stated above.  Consequently, Lockport Redevelopment rejected the bank's offer and demanded that the bank resolve the zoning problem and implement the ATM lease as required by the purchase and sale agreement.

22.     On November 19, 2021, two days after the November 17 deadline called for by the amendment to the purchase and sale agreement, Fifth Third Bank demanded that the transaction must close by November 23, or Fifth Third Bank would "send . . . a notice of default."  Fifth Third Bank's demand required Lockport Redevelopment to close (1) without the property management reports and (2) with a rent credit in lieu of the valuable ATM lease-back agreement.

23.     Also on November 19, 2021 -- at the same time Fifth Third Bank was demanding a closing by November 23 -- the bank relisted the property for sale on the open

market, thus demonstrating its intent not to close the transaction, even on its own demanded terms. A copy of the November 19 listing is attached as Exhibit C.

24. Lockport Redevelopment did not agree to close on the terms demanded by Fifth Third Bank, which departed from its prior agreements and as reflected in the purchase and sale agreement.

25. By failing to close the transaction pursuant to its prior agreements and as reflected in the purchase and sale agreement, Fifth Third Bank breached the purchase and sale agreement.

26. Under the purchase and sale agreement, Lockport Redevelopment "shall have the right to sue Seller for specific performance of this Agreement."

27. Lockport Redevelopment has no adequate remedy at law.

28. Fifth Third Bank, for its part, breached the purchase and sale agreement.

29. Lockport Redevelopment, for its part, was at all material times ready, willing and able to close, and performed all obligations it was required to perform under the purchase and sale agreement, except for those obligations it was unable to perform due to Fifth Third Bank's defaults.

30. Fifth Third Bank has stated without right that it intends to retain Lockport Redevelopment's non-refundable deposit of $100,000, if Lockport Redevelopment continues to insist on the bank's full performance of its obligations under the purchase and sale agreement, instead of accepting the bank's terms for closing on the transaction.

Wherefore, plaintiff Lockport Redevelopment LLC requests entry of a judgment of specific performance against defendant Fifth Third Bank, National Association, ordering Fifth Third Bank, National Association to close on the sale of the Lockport property to Lockport Redevelopment LLC in accordance with the purchase and sale agreement, together with its costs of suit.

### JURY DEMAND

Plaintiff demands trial by jury, on such matters that are deemed triable by jury in this case.

LOCKPORT REDEVELOPMENT LLC


By:   /s/ Glenn E. Heilizer
              One of its attorneys

Glenn E. Heilizer
HeilizerLaw
Five North Wabash Ave.
Suite 1304
Chicago, Illinois 60602
312-759-9000
glenn@heilizer.com
ARDC No. 6196412

Dated:  November 22, 2021

# EXHIBIT A

## REAL ESTATE PURCHASE AND SALE AGREEMENT

THIS REAL ESTATE PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into effective as of the 2nd day of September, 2021 (the "**Effective Date**"), by and between **FIFTH THIRD BANK, NATIONAL ASSOCIATION**, a federally chartered institution (the "**Seller**") and **LOCKPORT REDEVELOPMENT LLC**, an Illinois limited liability company (the "**Buyer**").

W I T N E S S E T H:

**WHEREAS**, Seller is the owner of that certain property located at 16732 W. 159th Street, Lockport, Illinois, together with all building improvements thereon (collectively, the "**Property**"); and

**WHEREAS**, Buyer desires to purchase the Property from Seller, and Seller desires to sell the Property to Buyer, on the terms and conditions set forth hereinafter.

**NOW THEREFORE**, in consideration of the Deposit (as defined below) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **SALE OF THE PROPERTY; ATM LEASE**.

    (a)    Seller agrees to bargain, sell, grant, convey and deliver the Property to Buyer, and Buyer agrees to purchase and accept the Property from Seller, for the price and on the terms and conditions set forth herein. Prior to Closing (as hereinafter defined), Seller may, in its sole discretion, remove any personal property located in or on the Property other than all furniture that is located at the Property as of the Effective Date, which furniture shall remain at the Property and shall be transferred to Buyer at closing as part of the Purchase Price (defined below); provided, however, and notwithstanding the foregoing, Seller may remove the following furniture from the Property prior to Closing: (i) seven (7) desks; (ii) six (6) black chairs; (iii) ten (10) white conference room chairs and (iv) any remaining customer chairs. Any personal property left at the Property by Seller at Closing shall be included in the Purchase Price. Notwithstanding anything contained herein to the contrary, the following shall be excluded from the "Property" and shall not be conveyed to Buyer at Closing: the existing ATM located on the Property and any equipment and facilities related to the ATM. In addition, without limiting the generality of the foregoing, Seller may, at Seller's option, prior to Closing, (i) remove or de-brand any existing signage located on the Property and/or (ii) remove any cameras and/or other security related equipment.

    (b)    At Closing, Seller shall lease back from Buyer sufficient space on the Property (the "**Leased Premises**") in order for Seller to continue to operate its existing ATM on the Property for a period of two (2) years after Closing pursuant to an ATM Lease in the form attached hereto as Exhibit B which is hereby incorporated herein by this reference (the "**Lease**").

2. **PURCHASE PRICE; PAYMENT OF PURCHASE PRICE**.

    (a)    Purchase Price. The total purchase price for the Property is Six Hundred Fifty-Five Thousand and 00/100 DOLLARS ($655,000.00) (the "**Purchase Price**") payable by Buyer to Seller at the Closing, subject to prorations and other credits provided for in this Agreement.

    (b)    Payment of Purchase Price. The Purchase Price shall be paid in the following manner:

US2008 18695510 5

EXHIBIT A

(i)      On the Effective Date, Buyer shall deliver to a title insurance company located in Illinois that is reasonably acceptable to Seller (the "**Escrow Agent**") an earnest money deposit in the amount of One Hundred Thousand and 00/100 DOLLARS ($100,000.00) (the "**Deposit**") which shall be payable by wire transfer of immediately available United States funds. The Deposit shall be deposited by Escrow Agent in an account at a federally insured depositary institution, with the interest thereon (if any) being reported to the Internal Revenue Service based on Buyer's federal taxpayer identification number, to be held by Escrow Agent in escrow pending Closing or other disbursement in accordance with the terms of this Agreement. Buyer understands and agrees that notwithstanding anything contained in the Agreement to the contrary, from and after the Effective Date, the Deposit shall be deemed to be "hard" and earned by Seller, such that if this Agreement is terminated for any reason by either party prior to Closing (except in the event of a Seller default, in which case the Deposit shall be returned to Buyer), the Deposit shall be immediately paid to Seller.

(ii)      On the Closing Date (as hereinafter defined), and subject to the terms of this Agreement, Buyer shall pay to Seller the Purchase Price by wire transfer of immediately available United States funds as directed by Seller. The Deposit shall be applied to the Purchase Price at Closing.

3.      **INSPECTION PERIOD; DUE DILIGENCE MATERIALS; TERMINATION**.

(a)      Inspection Period.  Commencing on the Effective Date, and for a period ending thirty (30) days thereafter at 5:00 p.m. Eastern Standard Time (the "**Inspection Period**"), Buyer and Buyer's agents shall have the right (upon prior written notice to and coordination with Seller) to enter upon the Property for the limited purpose of performing such non-invasive inspections, studies and tests thereon as Buyer may deem reasonably appropriate, subject to the terms of this Agreement. Prior to any entry onto the Property by Buyer or its agents, Buyer shall provide to Seller a certificate of insurance evidencing that Buyer carries commercial general liability insurance in an amount not less than $1,000,000 for injury or death of one person in any one occurrence and in an amount not less than $2,000,000 for injury or death of more than one person in any one occurrence and against liability for damage to property in the amount of $2,000,000 for each occurrence for Buyer and all of its agents seeking access to the Property, naming Seller as additional insured. Such insurance shall be maintained by Buyer in full force and effect until the earlier of Closing or the termination of this Agreement. Buyer agrees that notwithstanding the foregoing or anything herein to the contrary, Buyer shall have no right to perform a Phase II environmental study on the Property without first obtaining Seller's express written consent which may be withheld for any or no reason. Buyer acknowledges that it shall assume all risks involved in entering upon the Property for the performance of such activities by Buyer or Buyer's agents, and shall indemnify, defend and hold Seller harmless from and against all loss, liability, costs, claims, demands, damages, actions, causes of action, suits and expenses (including but not limited to attorneys' fees, expert witness fees and court costs) arising out of, related to or caused by such activities. Furthermore, in the event that this Agreement fails to close for any reason whatsoever, Buyer shall, at its sole cost and expense, repair any damage to the Property caused by Buyer's activities on the Property, and shall return the Property to the condition it was in prior to Buyer's activities on the Property. Notwithstanding the foregoing, Buyer's rights under this paragraph are subject to the following limitations, covenants and agreements: (i) prior to any entry onto the Property by Buyer or its agents, Buyer shall give Seller notice at least one (1) business day before conducting any inspections on the Property, and a representative of Seller shall have the right to be present when Buyer or its representatives conducts its or their investigations on the Property; (ii) neither Buyer nor its representatives shall interfere with the use, occupancy or enjoyment of the Property by Seller or other occupants thereof; (iii) neither Buyer nor its agents shall damage the Property or any portion thereof; (iv) Buyer shall, at its sole cost and expense, comply with all applicable federal, state and local laws, statutes, rules regulations, ordinances, and policies in conducting any of its inspections or testing of the Property; (v) Buyer agrees to keep the Property free from any and all liens arising out of any work performed, materials furnished or obligations

incurred by or on behalf of Buyer or Buyer's representatives or agents in connection with any inspection or testing, and if any such lien shall at any time be filed, Buyer shall cause the same to be discharged of record within ten (10) days thereafter by satisfying the same (and if Buyer fails to do so, Seller may discharge the same at Buyer's expense and receive an applicable portion of the Deposit from the Escrow Agent to reimburse Seller therefor); (vi) except as approved by Seller in writing, in no event shall Buyer or Buyer's representatives or agents have the right to place any materials or equipment on the Property (including without limitation, signs or other advertising material) until after the Closing has occurred; and (vii) Buyer and Buyer's representatives and agents hereby waive any and all claims against Seller, and Seller's agents for any injury to persons or damage to property arising out of any inspections or other work performed by Buyer or its representatives and agents, including but not limited to any damage to the tools and equipment of Buyer and Buyer's representatives and agents, all of which shall be brought onto the Property at the sole risk and responsibility of Buyer and Buyer's representatives and agents.

(b)     Buyer Due Diligence Materials.  Within five (5) days after the execution of this Agreement, Seller shall deliver, or cause to be delivered, to Buyer, all of the due diligence materials outlined on Exhibit A, if and to the extent in Seller's possession as of the Effective Date and if and to the extent the same are not confidential or proprietary.  In the event that the transactions contemplated herein fail to close for any reason whatsoever, Buyer hereby agrees that Buyer shall immediately deliver to Seller, at Buyer's cost and expense and at no cost or expense to Seller: (i) a list setting forth the names of all persons or entities who conducted investigations, examinations, tests or inspections of or with respect to the Property on behalf of or at the instance of Buyer, (ii) all reports, studies, surveys, site plans and other written or graphic material of any kind or nature whatsoever generated, collected, prepared or compiled in connection with such investigations, examinations, tests or inspections (collectively, the **"Due Diligence Materials"**), (iii) any and all reports, studies, surveys, site plans and other written or graphic material of any kind or nature whatsoever furnished to Buyer by Seller, without retaining copies thereof and (iv) any keys to the Property provided to Buyer.  Notwithstanding anything contained herein to the contrary, no termination of this Agreement by Buyer pursuant to any provision of this Agreement permitting termination by Buyer shall be deemed effective unless and until Buyer shall have delivered to Seller all items required by this grammatical paragraph.  All inspections, examinations and studies of the Property shall be at Buyer's sole cost and expense.  All of Buyer's duties and obligations under this Section 3 shall survive the termination of this Agreement or the closing of the transactions contemplated in this Agreement.

(c)     Termination Notice.  Should Buyer determine during the Inspection Period that Buyer does not desire to purchase the Property, then Buyer may terminate this Agreement by, prior to the expiration of the Inspection Period: (i) delivering written notice to Seller of Buyer's desire to terminate this Agreement, and (ii) delivering to Seller the Due Diligence Materials and otherwise complying with Buyer's obligations under this Section 3 (collectively, the **"Termination Requirements"**).  Should Buyer timely comply with the Termination Requirements, then (i) this Agreement shall thereupon become null, void and of no further effect, (ii) the parties shall be relieved of all obligations hereunder (except for those duties and obligations that expressly survive the termination of this Agreement), and (iii) the Deposit shall immediately be paid to Seller.  Should Buyer not timely comply with the Termination Requirements, then this Agreement shall continue in full force and effect, and Buyer shall be deemed to have accepted the condition of the Property and irrevocably waived its right to terminate this Agreement for any reason whatsoever other than for (i) Seller's subsequent default hereunder, or (ii) the non-occurrence of the conditions to closing set forth in Section 6 of this Agreement.

4.     **SURVEY AND TITLE**.

(a)     Survey.  Prior to the expiration of the Inspection Period, Buyer may, at Buyer's option, obtain a survey of the Property (the **"Survey"**).  Should Buyer elect to obtain a survey, Seller shall

provide a credit to Buyer towards the Purchase Price at Closing equal to the lesser of $3,000.00 or the actual cost incurred by Buyer for such Survey (as evidenced by a paid invoice from the surveyor). Seller shall also provide a copy of any surveys it has with the due diligence materials. If Buyer obtains a Survey, Buyer shall promptly provide Seller with a copy thereof. Buyer shall have until the expiration of the Inspection Period to approve the Survey or the survey provided by Seller with the due diligence materials (if any), or to notify Seller in writing of its objections thereto, if any (the "**Survey Objections**"). Buyer's failure to timely provide Survey Objections to Seller shall be deemed a waiver of Buyer's right to object to any matters related to survey. If Buyer raises any Survey Objections, then Seller may, but shall have no obligation to, cure and remove such Survey Objections on or before the Closing Date at Seller's expense. If Seller notifies Buyer ("**Seller's Survey Notification**") that Seller is unwilling or unable to cure the Survey Objections on or before the Closing Date, then Seller shall not be in default hereunder, and Buyer shall have as its sole and exclusive remedy, the option to (i) terminate this Agreement by providing Seller with written notice of its intent to do so no later than the earlier of five (5) days after Buyer's receipt of Seller's Survey Notification or the Closing Date (failure to timely provide such notice to Seller shall be deemed a waiver of Buyer's right to terminate under this Section 4(a)), or (ii) waive such defects and proceed to close the transactions contemplated herein, accepting the Property as it then is and without setoff or reduction in the Purchase Price. In the event Buyer shall timely elect to terminate because of an uncured Survey Objection, (i) the parties hereto shall be relieved of all rights and obligations hereunder, except for those rights and obligations which expressly survive the termination of this Agreement, (ii) Escrow Agent shall immediately pay the Deposit to Buyer in the event that any such Survey Objection would have a material and unreasonable adverse effect on Buyer's use of the Property and (iii) Escrow Agent shall immediately pay the Deposit to Seller in the event that none of the Survey Objections would have a material and unreasonable adverse effect on Buyer's use of the Property.

(b)     Title. Prior to the expiration of the Inspection Period, Buyer shall conduct a title examination of the Property and obtain a commitment or binder for issuance of an owner's title insurance policy issued by a title insurance company of Buyer's choice. Buyer shall have until the expiration of the Inspection Period to provide Seller with written notice of Buyer's objections to the title of the Property, if any (the "**Title Objections**"). Buyer's failure to timely provide Title Objections to Seller shall be deemed a waiver of Buyer's right to object to any matters related to the title to the Property. If Buyer raises any Title Objections, then Seller may, but shall have no obligation to, cure and remove such Title Objections on or before the Closing Date at Seller's expense. If Seller notifies Buyer ("**Seller's Title Notification**") that Seller is unwilling or unable to cure the Title Objections on or before the Closing Date, then Seller shall not be in default hereunder, and Buyer shall have as its sole and exclusive remedy, the option to (i) terminate this Agreement by providing Seller with written notice of its intent to do so no later than the earlier of five (5) days after Buyer's receipt of Seller's Title Notification or the Closing Date (failure to timely provide such notice to Seller shall be deemed a waiver of Buyer's right to terminate under this Section 4(b)), or (ii) waive such defects and proceed to close the transactions contemplated herein, accepting title to the Property as it then is and without setoff or reduction in the Purchase Price. In the event Buyer shall timely elect to terminate because of an uncured Title Objection, (i) the parties hereto shall be relieved of all rights and obligations hereunder, except for those rights and obligations which expressly survive the termination of this Agreement, (ii) Escrow Agent shall immediately pay the Deposit to Buyer in the event that any such Title Objection would have a material and unreasonable adverse effect on Buyer's use of the Property and (iii) Escrow Agent shall immediately pay the Deposit to Seller in the event that none of the Title Objections would have a material and unreasonable adverse effect on Buyer's use of the Property.

5.     **CLOSING**. Buyer and Seller agree that the Closing shall occur as follows:

(a)     Place and Date of Closing.  The consummation of the transactions contemplated under this Agreement (the "**Closing**") shall occur by mail escrow, via the Escrow Agent, on or before the date that is thirty (30) days after the expiration of the Inspection Period (the "**Closing Date**").

(b)     Seller's Instruments.  At the Closing, Seller shall deliver or cause to be delivered to Buyer the following items:

(i)     A special warranty deed executed by Seller conveying to Buyer fee simple title to the Property (the "**Deed**"), subject to (A) non-delinquent real property taxes and assessments, (B) all easements, covenants, conditions, restrictions and other agreements of record, (C) all matters which would be disclosed by a recent and accurate survey of the Property, (D) public streets and legal highways, (E) municipal, zoning and subdivision laws and ordinances, (F) the Lease, (G) a restriction (which shall be a perpetual use restriction as to Buyer, but which will be applicable for only two (2) years after the Closing Date with respect to any person or entity other than Buyer) prohibiting the use of any portion of the Property for any Marijuana Uses (as defined herein).  As used herein "Marijuana Uses" will mean any marijuana related activities, including but not limited to the possession, sale, cultivation, manufacturing, dispensing or distribution of marijuana for medical or recreational purposes, and/or the sale, manufacturing, dispensing or distribution of paraphernalia for use with marijuana or illicit drugs, and (H) a restriction which will run with the Property until the date that is ten (10) years after the Closing Date, prohibiting Buyer, its successors and assigns from operating, constructing on or placing signage relating to or otherwise advertising on or relating to (including but not limited to "Coming Soon" signs) any financial institutions, banks, savings and loans, trust companies, ATM's, automated teller machines or other free standing cash dispensing or financial transaction machines, stock brokerages, mortgage companies, brokerages, credit unions, or any type of financial services entity or any entity offering any Banking Services (as defined herein), on the Property or any portion thereof and from permitting any third party to use, construct or place signage on or otherwise advertise on or related to (including but not limited to "Coming Soon" signs) the Property for or relating to any type of brokerage, mortgage and financial services and Banking Services.  As used herein "**Banking Services**" will mean the provision of checking, savings, check cashing, credit card, commercial loan, consumer loan, residential loan, international letters of credit, trust, automatic teller, securities brokerage, and other financial services provided by commercial banking and savings and loan institutions to commercial and consumer customers. The Deed shall provide that in the event of a breach, or attempted or threatened breach of such use restrictions, Seller or its successors or assigns, shall be entitled to full and adequate relief by injunction and all other available legal and equitable remedies from the consequences of such breach. Notwithstanding the foregoing, the restrictions set forth above shall not in any event restrict Seller's right to use the Leased Premises in accordance with the terms of the Lease. The Deed shall convey the Property by the legal description of the Property as acquired by Seller.

(ii)     A non-foreign status affidavit executed by Seller.

(iii)     A closing statement duly executed by Seller setting forth the prorations and adjustments required by this Agreement or otherwise agreed to by Buyer and Seller.

(iv)     Evidence of authority to execute the closing documents required of Seller hereunder and enter into this Agreement.

(v)     An ALTA Statement limited to Seller's period of ownership of the Property that is reasonably acceptable to Seller and that is necessary for Buyer to obtain a title insurance policy insuring the Property without exception for construction, mechanic's or materialman's liens against the Property.

(vi)     The Lease.

(vii)    Any required state, county or municipal transfer tax forms.

(viii)   A memorandum of the Lease in a form that is reasonably acceptable to Buyer and Seller (the "**Memorandum**"), to be recorded at Closing.

(ix)     Bill of Sale conveying to Buyer all personal property located on the Property as of the Closing Date, excluding the existing ATM located on the Property and any equipment and facilities related to the ATM.

(x)      A certificate from Seller stating that, if and to the extent true and accurate, the representations and warranties of Seller contained in this Agreement are true and accurate in all material respects to Seller's Knowledge (as hereinafter defined) as of the Closing Date.

(c)     Buyer's Instruments.  At the Closing, Buyer shall deliver or cause to be delivered to Seller the following items:

(i)      The Purchase Price.

(ii)     A closing statement duly executed by Buyer setting forth the prorations and adjustments required by this Agreement or otherwise agreed to by Buyer and Seller.

(iii)    Evidence of authority to enter into this Agreement and to execute the closing documents required of Buyer hereunder.

(iv)     The Lease.

(v)      The Memorandum.

(vi)     Any required state, county or municipal transfer tax forms.

6.     **CONDITIONS TO CLOSING**.  Buyer's obligation to close on the transaction contemplated in this Agreement is subject to and contingent upon (i) there being no material, adverse change in title to the Property after the expiration of the Inspection Period which is not cured by Seller and (ii) the representations and warranties made by Seller under Section 12 of this Agreement being true and correct in all material respects as of the Closing Date.   In the event that the transaction contemplated herein closes, Buyer hereby expressly agrees that the conditions set forth in this Section 6 shall be deemed waived by Buyer.

7.     **CLOSING COSTS**.  Seller shall pay the following: (a) the cost of preparation of the Deed and the other documents to be delivered by Seller, (b) any transfer tax imposed by any state, county or local authority on the transfer of title, which is normally allocated to sellers, if any, (c) its proportionate share of the expenses to be prorated as set forth in this Agreement, (d) any brokerage commission owed by Seller under this Agreement and (e) one-half of any closing fee, escrow fee or similar fee charged by Escrow Agent.  Buyer shall pay the following: (a) the cost of preparation of the documents to be delivered by Buyer, (b) the Deed recording fee, (c) the costs of obtaining the Survey, title insurance commitment, title insurance policy, environmental audit and other due diligence reports, (d) its proportionate share of the expenses to be prorated as set forth in this Agreement, (e) one-half of any closing fee, escrow fee or similar fee charged by Escrow Agent, (f) any brokerage commission owed by Buyer under this Agreement and (g) any transfer tax imposed by any state, county or local authority on

the transfer of title, which is normally allocated to buyers, if any. Except as otherwise provided herein, each party hereto agrees to bear its own expenses, including but not limited to, attorneys' and advisors' fees.

8.    **ADJUSTMENTS AND PRORATIONS**. Ad valorem taxes and assessments and other expenses relating to the Property shall be prorated as of the Closing Date in the manner customary under the laws and practices of the state and county in which the Property is located, based upon actual days involved. To the extent that the actual amounts of such charges and expenses referred to in this paragraph are unavailable at the Closing Date, the closing statement shall be based upon estimated amounts, and a readjustment of these items shall be made upon the request by either party to this Agreement within thirty (30) days after the Closing Date. In the event that ad valorem taxes for the year of Closing have not been established as of the Closing Date, Seller and Buyer agree to prorate ad valorem taxes based upon 105% percent of the actual taxes for the preceding year (assuming the greatest discount for the earliest possible payment thereof) and in the event the actual taxes differ from such estimate, Seller and Buyer agree to adjust the proration upon the request by either party to this Agreement. Any such adjustment payment shall be made within fifteen (15) days after notification by either party that such adjustment is necessary.

Seller and Buyer hereby agree that if ad valorem taxes for the Property for the year of Closing may be paid at Closing, the same shall be paid at Closing. In the event that such ad valorem taxes for the year of Closing cannot be paid at Closing, then the parties shall prorate said taxes in accordance with this Section 8, and Buyer shall thereafter pay said ad valorem taxes for the Property for the year of Closing before said taxes become delinquent. Buyer agrees to, and hereby does, indemnify and hold Seller harmless of and from any and all liabilities, claims, demands and expenses, of any kind or nature arising out of or with respect to Buyer's failure to timely pay said taxes in accordance with the preceding sentence. Buyer's obligations under this paragraph shall survive Closing.

Notwithstanding the foregoing, no prorations will be made in relation to insurance premiums, and Seller's insurance policies will not be assigned to Buyer. Notwithstanding the foregoing, final readings and final billings for utilities will be made as of the Closing Date, and all utilities consumed on the Property before the Closing Date shall be at Seller's expense. Seller will be entitled to all deposits presently in effect with the utility providers, and Buyer will be obligated to make its own arrangements for deposits with the utility providers. Buyer acknowledges and agrees that any "rollback" or similar taxes, or any increases in taxes (whether for periods before or after the Closing Date) imposed because of a change in use or ownership of the Property shall be the sole and exclusive responsibility of Buyer, and that Seller shall have no obligation in connection therewith.

9.    **DELIVERY OF POSSESSION; CASUALTY**. Possession of the Property will be delivered to Buyer on the Closing Date, subject to the rights of Seller under the Lease. If prior to the Closing Date there shall occur damage to the Property caused by fire or other casualty, then the Closing shall take place as provided herein, and Seller shall assign to Buyer all rights to insurance proceeds and claims, if any, available as a result of such destruction or damage.

10.    **CONDEMNATION**. If, prior to the Closing Date, all or any part of the Property is taken by any governmental authority under its power of eminent domain, Buyer shall take title to the Property at Closing without any abatement or adjustment in the Purchase Price, in which event Seller shall unconditionally assign its rights in the condemnation award to Buyer (or Buyer shall receive the condemnation award from Seller if it has already been paid to Seller prior to Closing).

US2008 18695510 5

11.    **DEFAULT; REMEDY**.

If the purchase and sale of the Property contemplated hereby is not consummated in accordance with the terms and provisions of this Agreement due to circumstances or conditions which constitute a default by Seller under this Agreement, Buyer shall have the option, as its sole and exclusive remedy, to (a) waive such default, (b) terminate this Agreement by written notice to Seller and upon such termination receive the Deposit, or (c) if and only if, Seller's default is a refusal by Seller to convey the Property to Buyer as required by this Agreement, then Buyer shall have the right to sue Seller for specific performance of this Agreement. Under no circumstances shall Seller be liable to Buyer for damages, whether actual, consequential, punitive, speculative, or otherwise as a result of Seller's default hereunder; provided that nothing in this sentence shall limit or impair Seller's liability with respect to its indemnity obligations set forth in this Agreement.

If the purchase and sale of the Property contemplated hereby is not consummated in accordance with the terms and provisions of this Agreement due to circumstances or conditions which constitute a default by Buyer under this Agreement, Seller shall have the option to (a) terminate this Agreement by written notice to Buyer and upon such termination the Deposit shall immediately be paid to Seller or (b) sue Buyer for specific performance. Under no circumstances shall Buyer be liable to Seller for damages, whether actual, consequential, punitive, speculative, or otherwise, as a result of Buyer's default hereunder; provided that nothing in this sentence shall limit or impair Buyer's liability with respect to its indemnity obligations set forth in this Agreement.

Except as expressly provided herein, if either Buyer or Seller elects to obtain from Escrow Agent the Deposit as set forth above, upon termination of this Agreement and Escrow Agent's disposition of the Deposit pursuant to the terms of this Section 11, this Agreement shall be deemed null and void and of no further force or effect, and no party hereto shall thereafter have any rights, duties, liabilities, or obligations whatsoever hereunder (except for those rights, duties, liabilities, or obligations that are stated herein to survive the termination of this Agreement).

12.    **REPRESENTATIONS AND WARRANTIES.**

Seller hereby makes the following representations and warranties, to Seller's Knowledge, as of the Effective Date:

(a)     Seller is a duly formed and validly existing federally chartered institution in good standing. Seller has obtained all necessary authorizations and consents to enable it to execute and deliver this Agreement and to consummate the transaction contemplated hereby. This Agreement and the other documents to be executed by Seller hereunder will have been duly entered into by Seller and will constitute legal, valid and binding obligations of Seller enforceable in accordance with their respective terms. Each person who executes this Agreement and all other instruments and documents in connection herewith on behalf of Seller, has or will have due power and authority to so act.

(b)     Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended.

(c)     Neither the execution, delivery, performance of or compliance with this Agreement and all other agreements contemplated hereby, nor the conveyance and sale of the Property to Buyer pursuant to this Agreement, will (i) violate or conflict with Seller's organizational documents, (ii) result in any breach or violation of, or be in conflict with, or constitute a default under, any mortgage, indenture, contract, agreement, lease, instrument,

judgment, decree, order, or award binding on Seller or to which Seller is a party, or (iii) result in the acceleration of any indebtedness or other obligation of, or create any mortgage, pledge, lien or encumbrance on any of the properties or assets of, Seller, and there is no such provision in any such document which materially adversely affects or would materially adversely affect the operation of the Property.

(d)     Except for any matters of title, no party has a right of possession in the Property.   There are no leases or other agreements in effect with respect to the use and occupancy of the Property (other than for any matters of title) that will be binding upon Buyer after the Closing.

(e)     Seller has not: (i) made a general assignment for the benefit of creditors; (ii) filed any voluntary petition in bankruptcy; (iii) received notice of the appointment of a receiver to take possession of all or substantially all of its assets; (iv) received notice of the attachment or other judicial seizure of all or substantially all of its assets; (v) admitted in writing its inability to pay its debts as they come due; or (vi) made an offer of settlement, extension or composition to its creditors generally.

(f)     There is no litigation, arbitration or administrative proceeding pending or threatened with respect to (or which would have a material adverse impact upon) the Property.

(g)     Seller has received no written notice from any governmental authority with jurisdiction over the Property: (i) alleging any current violation of any laws (including environmental laws) applicable to the Property which remains uncured; or (ii) of any action or governmental proceeding for condemnation, or for a zoning change.

(h)     Seller has not received any written notice from any governmental authority with jurisdiction over the Property advising Seller that the Property is in violation of any federal, state or local law, ordinance, code, regulation, rule, order or decree regulating, relating to or imposing liability or standards of conduct concerning, any environmental conditions, health or industrial hygiene.

(i)     Seller is the fee owner of the Property.  Except for any matters of record, no person or entity has any right of first refusal or option to acquire any interest in the Property or any part thereof.

(j)     Neither Seller nor the Property is subject to any agreement or obligation, including but not limited to, any right of first refusal, redemption right or option to purchase in favor of a third party, which would or could prevent Seller from completing the transfer of the Property under this Agreement.

(k)     The Property is not encumbered by any unrecorded declaration or other unrecorded agreement transferring any development rights or air rights appurtenant to the Property to any other property.

(l)     Seller has not transferred (except pursuant to any matters of record), and after the date hereof will not transfer, any development rights applicable to the Property.

(m)     Seller will not, between the Effective Date and the date of the Closing, intentionally encumber title to the Property in any way.

Except as expressly stated above in this Section 12, Seller makes no representation or warranty with respect to the Property. If, prior to Closing, Buyer or Seller discovers or becomes aware of any matter, fact or condition that would make a representation or warranty given by Seller in this Agreement untrue or incorrect in any respect, then at that time Buyer shall either (i) elect to accept such modified representation or warranty as Seller may then give, and proceed to Closing hereunder, thereby waiving its rights to object to the matter or matters which are the subject of the aforesaid modification, or (ii) notify Seller that it intends to terminate this Agreement as a result thereof. If Buyer notifies Seller of its intent to terminate this Agreement, the Deposit shall be returned to Buyer, and neither party will have any further rights or obligations under this Agreement (except for any that expressly survive the termination hereof). Should Buyer elect not to terminate this Agreement and proceeds to Closing hereunder notwithstanding such matters, facts or conditions, then by such election, Buyer shall be deemed to have waived (i) any objection to such matters, facts or conditions that are the subject of any such modified representation or warranty and (ii) any rights Buyer otherwise might have to assert a claim against Seller for a breach of a representation or warranty with respect to such matters, facts or conditions, Buyer hereby acknowledging that its right to terminate this Agreement and to receive a return of the Deposit is Buyer's sole and exclusive remedy for a breach of a representation or warranty by Seller disclosed to or discovered or known by Buyer prior to Closing. For purposes of this Agreement, the phrase "Seller's Knowledge", "to Seller's knowledge", "to Seller's actual knowledge" or "to the best of Seller's knowledge" or similar qualifying phrases and words of similar import shall mean the current actual, not constructive, knowledge of Lisa Corpus (as Vice President and Regional Real Estate Director), without independent investigation or inquiry, and not otherwise. Lisa Corpus is a representative of Seller acting for Seller, and in no manner, expressly or impliedly, is he making any representations or warranties individually. Neither Lisa Corpus, nor any officer, director, shareholder, partner, member, trustee or representative of Seller or of any partner or member of Seller, shall be personally liable in any manner for any breach of a representation or warranty by Seller in this Agreement, Seller's liability for a breach of a representation or warranty by Seller being limited to Seller's interest in the Property and being further subject to the terms of this Section 12.

Buyer, to the best of its knowledge, represents and warrants as of the Effective Date which representations and warranties shall be remade by Buyer as of Closing as a condition of Closing and shall survive Closing:

        (a)      Buyer is a duly formed and validly existing entity in good standing with the State of its organization. Buyer has obtained all necessary authorizations and consents to enable it to execute and deliver this Agreement and to consummate the transaction contemplated hereby. This Agreement and the other documents to be executed by Buyer hereunder will have been duly entered into by Buyer and will constitute legal, valid and binding obligations of Buyer enforceable in accordance with their respective terms. Each person who executes this Agreement and all other instruments and documents in connection herewith on behalf of Buyer, has or will have due power and authority to so act.

        (b)      The execution, delivery and performance of this Agreement and the Closing hereunder will not conflict with any agreement, contract or law applicable to Buyer nor constitute a default under any agreement or instrument to which Buyer is a party or by which Buyer is bound.

        (c)      Buyer has not: (i) made a general assignment for the benefit of creditors; (ii) filed any voluntary petition in bankruptcy against it; (iii) received notice of the appointment of a receiver to take possession of all or substantially all of its assets; (iv) received notice of the attachment or other judicial seizure of all or substantially all of its assets; (v)

admitted in writing its inability to pay its debts as they come due; or (vi) made an offer of settlement, extension or composition to its creditors generally.

(d)     Buyer is fully and adequately capitalized and not insolvent as of the Effective Date.

(e)     Neither the execution, delivery, performance of or compliance with this Agreement and all other agreements contemplated hereby, nor purchase of the Property from Seller, will (i) violate or conflict with Buyer's organizational documents, (ii) result in any breach or violation of, or be in conflict with, or constitute a default under, any mortgage, indenture, contract, agreement, lease, instrument, judgment, decree, order, or award binding on Buyer or to which Buyer is a party, or (iii) result in the acceleration of any indebtedness or other obligation of, or create any mortgage, pledge, lien or encumbrance on any of the properties or assets of Buyer and there is no such provision in any such document which materially adversely affects or would materially adversely affect the operation of the Property after Closing.

(f)     To Buyer's knowledge, there is no litigation, arbitration or administrative proceeding pending or threatened with respect to (or which would have a material adverse impact upon) the Property, Buyer or this Agreement.

13.     **ESCROW AGENT**.  The parties agree that Escrow Agent shall have no liability under this Agreement except to account for the Deposit as specified herein, and except for Escrow Agent's gross negligence.  Without limiting the generality of the foregoing, Escrow Agent shall not be liable for any loss or damage resulting from any of the following: any defects or conditions of title to the Property; the legal effect of any instrument exchanged by the parties hereto; any default, error, action or omission of any other party; any good faith act or forbearance by Escrow Agent; any loss or impairment of the funds deposited in escrow in the course of collection or while on deposit with a trust company, bank, savings bank or savings association resulting from failure, insolvency or suspension of such institution or while in transit by wire transfer or otherwise; or Escrow Agent complying with any legal process, writs, orders, judgments and decrees of any court, whether issued with or without jurisdiction, and whether or not subsequently vacated, modified, set aside or reversed.  Upon disbursement of the Deposit, Escrow Agent shall be relieved of all further liability and responsibility in connection with this Agreement and the escrow.  In the event any demand is made upon Escrow Agent concerning the Deposit, or at any time for any cause or for no cause, Escrow Agent, at its election and in its sole discretion, may cause the Deposit to be delivered to a court of competent jurisdiction to determine the rights of Seller and Buyer, or to interplead Seller and Buyer by an action brought in any such court.  Deposit by Escrow Agent into such court of the Deposit shall relieve Escrow Agent of all further liability and responsibility in connection with this Agreement and the escrow.

14.     **MISCELLANEOUS**.  It is further agreed as follows:

(a)     Notice.  All notices, demands, requests, consents, approvals or other communications (the "**Notices**") required or permitted to be given by this Agreement shall be in writing and shall be (i) personally delivered, (ii) sent via FedEx or other regularly scheduled overnight courier or sent by United States mail, registered or certified with return receipt requested, properly addressed and with the full postage prepaid, or (iii) sent via email to an email address listed in this Section. Said Notices shall be deemed received and effective on the earlier of (i) the date actually received (which, in the case of Notices sent by overnight courier, shall be deemed to be the day following delivery of such Notices to such overnight courier), or (ii) three (3) business days after being placed in the United States Mail as aforesaid.

Said Notices shall be sent to the parties hereto at the following addresses, unless otherwise notified in writing:

| To Seller: | Fifth Third Bank<br>38 Fountain Square Plaza<br>MD 10ATA1<br>Cincinnati, Ohio 45263<br>Attn: Senior VP Enterprise Workplace Services |
| --- | --- |
| | |
| With copies to: | Fifth Third Bank<br>38 Fountain Square Plaza<br>MD 10903K<br>Cincinnati, Ohio 45202<br>Attn: Lisa Corpus<br>Email: lisa.corpus@53.com<br><br>And:<br><br>Todd Burbank, Esq.<br>Kilpatrick Townsend & Stockton LLP<br>214 N. Tryon Street, Suite 2400<br>Charlotte, NC 28202-2381<br>Email: tburbank@kilpatricktownsend.com |
| | |
| To Buyer: | Lockport Redevelopment LLC<br>5629 W Cermak Road<br>Cicero IL 60804 |
| | |
| With copies to: | HeilizerLaw<br>5 N. Wabash Ave, Suite 1304<br>Chicago, Illinois 60602<br>Attention: Glenn E. Heilizer<br>Email: glenn@heilizer.com |

(b)     Brokerage.  Buyer represents and warrants to Seller that Buyer has not engaged any broker or brokerage company in connection with the Buyer's proposed purchase of the Property. Seller represents and warrants to Buyer that Seller has not engaged any broker or brokerage company other than CBRE, Inc. (the "Seller's Broker") in connection with the proposed sale of the Property to Buyer.  Seller agrees to pay a sales commission to Seller's Broker as required by a separate agreement between Seller and Seller's Broker and to indemnify and hold Buyer harmless from any liability, claim, damage or cost relating thereto. In the event of any claims for brokers', agents' or finders' fees or commissions by any person or entity other than the Seller's Broker in connection with the negotiation, execution or consummation of this Agreement, the party on whose alleged statement, representation or agreement such claim or liability arises shall indemnify, hold harmless and defend the other party from and against such claim, including without limitation attorneys' fees and costs.  The provisions of this paragraph shall survive Closing or termination of this Agreement.

(c)     Entire Agreement; Amendment.  This Agreement, together with all exhibits hereto and documents referred to herein, if any, constitutes the entire understanding among the parties

hereto, and supersedes any and all prior agreements, arrangements and understandings among the parties hereto. This Agreement may not be amended, modified, changed or supplemented, nor may any obligations hereunder be waived, except by a writing signed by the party to be charged or by its agent duly authorized in writing or as otherwise permitted herein.

(d)     Binding Effect.  Except as otherwise provided herein, the provisions and covenants contained herein shall inure to and be binding upon the heirs, representatives, successors and permitted assigns of the parties hereto.

(e)     Assignment.  Buyer's rights hereunder may not be assigned in whole or in part without the prior written consent of Seller; provided, however, Buyer may assign this Agreement to an entity that is owned and controlled by Buyer, provided that Seller receives an executed copy of an assignment and assumption agreement between Buyer and its assignee no later than the date that is ten (10) days prior to the Closing Date.  In the event of a permitted assignment, Buyer shall not be relieved of any of its duties, obligations or liabilities hereunder, instead Buyer, as assignor, and Buyer's assignee shall therefore be jointly and severally liable hereunder.  Any attempted assignment or transfer in violation of this provision shall be null and void.

(f)     Captions; Gender.  Captions are included solely for convenience of reference and shall not be considered in the interpretation of this Agreement.  Unless the context clearly indicates otherwise, the singular shall include the plural and vice versa.  Whenever the masculine, feminine or neuter gender is used herein, such gender shall be used as the context deems appropriate.

(g)     Time is of the Essence.  Time is of the essence of this Agreement.  Anywhere a day certain is stated for payment or for performance of any obligation, the day certain so stated enters into and becomes a part of the consideration for this Agreement.  If any date set forth in this Agreement shall fall on, or any time period set forth in this Agreement shall expire on, a day which is a Saturday, Sunday, federal or state holiday, or other non-business day, such date shall automatically be extended to, and the expiration of such time period shall automatically be extended to, the next day which is not a Saturday, Sunday, federal or state holiday or other non-business day.

(h)     Survival.  Except as otherwise expressly provided herein, no term, provision, condition, obligation, representation or warranty set forth herein shall survive the Closing or earlier termination of this Agreement.

(i)     Confidentiality.  Buyer acknowledges that Buyer may become privy to confidential information of Seller, in addition to information regarding certain physical characteristics of the Property learned by Buyer in the course of its examination of the Property.  Buyer therefore agrees to take all steps to ensure that any information with regard to Seller, the Property and/or to this transaction, which information is obtained by Buyer or any of its employees, officers, agents, counsel, accountants or representatives, shall remain confidential and shall not be disclosed or revealed to outside sources.  The provisions of this paragraph shall survive termination of this Agreement.

(j)     Governing Law.  This Agreement and each and every related document is to be governed by, and construed in accordance with, the laws of the State of Illinois.

(k)     Property Sold "As Is".  IT IS UNDERSTOOD AND AGREED BY BUYER THAT SELLER HAS NOT MADE AND IS NOT NOW MAKING, AND IT SPECIFICALLY DISCLAIMS AND NEGATES ANY AND ALL COVENANTS, WARRANTIES, REPRESENTATIONS OR GUARANTEES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE

PROPERTY, INCLUDING BUT NOT LIMITED TO, WARRANTIES, REPRESENTATIONS OR GUARANTIES AS TO (I) MATTERS OF TITLE, (II) ENVIRONMENTAL MATTERS RELATING TO THE PROPERTY OR ANY PORTION THEREOF, (III) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER, RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES, (IV) WHETHER, AND THE EXTENT TO WHICH THE PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREAS, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD, (V) DRAINAGE, (VI) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING, (VII) ZONING TO WHICH THE PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT, (VIII) THE AVAILABILITY OF ANY UTILITIES TO THE PROPERTY OR ANY PORTION THEREOF, INCLUDING, WITHOUT LIMITATION, WATER, SEWAGE, GAS AND ELECTRIC, (IX) USAGE OF ADJOINING PROPERTY, (X) ACCESS TO THE PROPERTY OR ANY PORTION THEREOF, (XI) THE VALUE, COMPLIANCE WITH ANY PLANS AND SPECIFICATIONS, SIZE, LOCATION, LAND USE, DESIGN, QUALITY, DESCRIPTION, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE PROPERTY OR ANY PORTION THEREOF, (XII) COMPLIANCE OF THE PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE FEDERAL, STATE OR LOCAL ORDINANCES, CODES OR SIMILAR LAWS, BUILDING, FIRE OR ZONING ORDINANCES, CODES OR OTHER SIMILAR LAWS, (XIII) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS, (XIV) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE LAND, (XV) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE PROPERTY, (XVI) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENT AFFECTING THE PROPERTY, (XVII) THE MERCHANTABILITY OF THE PROPERTY OR FITNESS OF THE PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON SELLER'S SKILL OR JUDGMENT TO SELECT OR FURNISH THE PROPERTY FOR ANY PARTICULAR PURPOSE, AND THAT SELLER MAKES NO WARRANTY THAT THE PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE), (XVIII) TAX CONSEQUENCES (INCLUDING, BUT NOT LIMITED TO, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS), (XIX) THE INCOME TO BE DERIVED FROM THE PROPERTY, OR (XX) THE EXISTENCE OF ANY VIEW FROM THE PROPERTY OR THAT ANY EXISTING VIEW WILL NOT BE OBSTRUCTED IN THE FUTURE. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF OF BUYER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, BUYER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY

VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. THE SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS WITH ALL FAULTS AND LIMITATIONS." BUYER HAS FULLY REVIEWED THE DISCLAIMER AND WAIVERS SET FORTH IN THIS AGREEMENT WITH ITS COUNSEL AND UNDERSTANDS THE SIGNIFICANCE AND EFFECT THEREOF. BUYER HEREBY RELEASES SELLER FROM ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES WHICH BUYER OR ANY PARTY RELATED TO OR AFFILIATED WITH BUYER HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO THE PHYSICAL CONDITION OF THE PROPERTY, ANY CONSTRUCTION DEFECTS, ANY ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE PROPERTY, AND ANY ENVIRONMENTAL CONDITIONS AT, IN, OR UNDER THE PROPERTY, AND BUYER WILL NOT LOOK TO SELLER IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY BUYER SUBJECT TO THE FOREGOING. BUYER HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS AND DEALING WITH REAL ESTATE, THAT ENABLES BUYER TO EVALUATE THE MERIT AND RISKS OF THE TRANSACTION CONTEMPLATED HEREBY. BUYER IS NOT IN A DISPARATE BARGAINING POSITION VIS-A-VIS SELLER. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

(l)     Waiver. No claim of waiver, consent, or acquiescence with respect to any provision of this Agreement shall be made against any party hereto except on the basis of a written instrument executed by or on behalf of such party. However, the party for whose unilateral benefit a condition is herein inserted shall have the right to waive such condition.

(m)     Counterparts; Facsimile/Electronic Mail. This Agreement may be executed via facsimile or email (PDF) and in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute but one and the same instrument.

(n)     Rule of Construction. Seller and Buyer have experience with the subject matter of this Agreement, have been represented by counsel and have each fully participated in the negotiation and drafting of this Agreement. Accordingly, this Agreement shall be construed without regard to the rule that ambiguities in a document are to be construed against the drafter.

(o)     Patriot Act. Buyer hereby represents and warrants: (i) that none of the funds used by Buyer for payment of the Purchase Price of the Property are subject to any of the following laws of the United States: 18 U.S.C. §§ 1956-1957 (Laundering of Money Instruments); 18 U.S.C. §§ 981-986 (Federal Asset Forfeiture); 18 U.S.C. §§ 881 (Drug Property Seizure); Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001; or the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "**USA Patriot Act**"); and (ii) that Buyer is not a person or entity with whom United States citizens are restricted from doing business with under the regulations of the Office of Foreign Asset Control ("**OFAC**") of the United States Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act, or other governmental action. Buyer shall indemnify and hold Seller harmless from and against any and all claims, actions, fines, penalties and forfeitures arising out of or resulting from any such representation of Buyer that is

false, such indemnity to include payment of all costs of Seller in defending against any of the foregoing, including reasonable attorney fees.

(p)     No Reliance on Documents.  Except as expressly stated herein, Seller makes no representation or warranty as to the truth, accuracy or completeness of any materials, data or information delivered by Seller or its agents to Buyer in connection with the transaction contemplated hereby.  Buyer acknowledges and agrees that all materials, data and information delivered by Seller to Buyer in connection with the transaction contemplated hereby are provided to Buyer as a convenience only and that any reliance on or use of such materials, data or information by Buyer shall be at the sole risk of Buyer, except as otherwise expressly stated herein. Neither Seller nor any of its members, nor the person or entity which prepared any report or reports delivered by Seller to Buyer, shall have any liability to Buyer for any inaccuracy in or omission from any such reports.

(q)     Jury Trial.  Buyer hereby knowingly and voluntarily waives the right to a jury trial in any action, proceeding, or permissive counterclaim involving any matters whatsoever arising out of or in any way connected with the Property or this Agreement.

(r)     No Recording.  This Agreement shall not be recorded by Buyer in the real estate records of the county where the Property is located, or otherwise.

[REMAINDER OF PAGE INTENTIONALLY BLANK.  SIGNATURE PAGES FOLLOW.]

**IN WITNESS WHEREOF,** each of the undersigned have caused this Agreement to be executed on its behalf by its members, officers or agents thereunto as of the Effective Date first above written.

SELLER:

**FIFTH THIRD BANK, NATIONAL ASSOCIATION,** a federally chartered institution

By: _____
Name: VP-Real Estate Manager
Its: _____

By: _____
Name: Jeff Wagner
Its: VP-Real Estate Manager

BUYER:

**LOCKPORT REDEVELOPMENT LLC,** an Illinois limited liability company

By: _____
Name: FAYEZ DABLETH
Its: Sept 2, 2021

**IN WITNESS WHEREOF**, each of the undersigned have caused this Agreement to be executed on its behalf by its members, officers or agents thereunto as of the Effective Date first above written.

SELLER:

**FIFTH THIRD BANK, NATIONAL ASSOCIATION**, a federally chartered institution

By:_____
Name:_____
Its:_____


By:_____
Name:_____
Its:_____


BUYER:

**LOCKPORT REDEVELOPMENT LLC**, an Illinois limited liability company

By: _____
Name: _____Fayez Dahbieh_____
Its: ____MANAGER_____

Exhibit A

DUE DILIGENCE MATERIALS

1. existing surveys of the land comprising the Property;
2. building plans for any existing improvements;
3. third party reports and studies related to the physical condition of the Property;
4. correspondence and other documentation relative to violations of law
5. all service contracts affecting the Property that will survive Closing; and
6. copies of any written governmental permits or approvals.

US2008 18695510 5

Exhibit B

## ATM LEASE AGREEMENT

This ATM Lease Agreement (this "Lease") is entered into as of this _____ day of _____, 2021 ("Commencement Date"), between **FIFTH THIRD BANK, NATIONAL ASSOCIATION,** a federally chartered institution ("Tenant") and **LOCKPORT REDEVELOPMENT LLC,** an Illinois limited liability company (the "Landlord").

1.    **PREMISES:** The Landlord does hereby lease to Tenant sufficient space in the area in which Tenant's existing ATM is located on property located at 16732 W. 159th Street, Lockport, Illinois, for the operation of one (1) remotely controlled device which automatically performs certain services normally performed by a bank teller (hereinafter "ATM"). The ATM is located as depicted on Exhibit A, attached hereto and made a part hereof. The location of the ATM shall be referred to as the "Premises."

2.    **TERM:**

    a.    ***Term:*** The term of this Lease shall be for a period of two (2) (the "Term"), commencing on the Commencement Date and expiring on the date that is two (2) years thereafter.

    b.    ***Termination for low usage or damage***: At any time after the Commencement Date, Tenant determines that the ATM is not profitable, Tenant may terminate this Lease by giving written notice to Landlord. In the event the ATM is damaged or vandalized during the Term, Tenant shall have the right to terminate this Lease by giving written notice to Landlord. If Tenant terminates pursuant to this Section, Tenant shall pay all net monies up to and including the termination date, but shall have no further liability hereunder.

    c.    ***Holdover Tenancy:*** If, without the execution of a new lease or written extension and with the consent of Landlord, Tenant shall holdover after the expiration of the Term, Tenant shall be deemed to be occupying the Premises as a tenant from month to month, which tenancy may be terminated by either Landlord or Tenant upon thirty (30) days prior written notice to the other. During any holdover tenancy, Tenant agrees to pay to Landlord one hundred and twenty five percent (125%) of the monthly installment of Rent which was payable in the month immediately preceding the month in which the expiration or termination occurs, and to be otherwise bound by all of the other terms, covenants and conditions as herein specified.

3.    **RENT:** Rent shall be Two Hundred Fifty and 00/100 Dollars ($250.00) per month during the Term ("Rent"). Rent shall be due and payable by the first day of each month. Rent for any partial months shall be prorated based on the number of days in that month. Rent shall be payable to Landlord and shall be sent to [_____]. All Rent paid hereunder is gross Rent, and no additional sums shall be due from Tenant for electric, common area maintenance, taxes, insurance, etc.

4.    **MAINTENANCE, LIGHTING AND SIGNAGE:** Tenant, at its sole option and expense, shall have the right to place lighting and signage ancillary to the ATM on and around the ATM and the adjacent portions of the Premises in accordance with Tenant's standard practices and procedures and in accordance with applicable laws and ordinances. Tenant shall also have the right to keep and maintain during the Term any ATM signage located on Landlord's property as of the Commencement Date. Upon the expiration or earlier termination of this Lease, Tenant shall bear the cost of removing Tenant's signage from the Premises and repairing any damage to the Premises caused by such removal.

Tenant shall bear the cost of all installation and maintenance of its signage. Tenant shall maintain the ATM and its related signage and lighting at Tenant's sole cost and expense.

     5.    **COVENANTS OF TENANT:** Tenant does hereby covenant and agree that it shall: (i) not commit any waste on the Premises; (ii) not use or occupy the Premises for any unlawful purpose; and (iii) not make alterations or additions, subsequent to the installation, on or to the Premises without the written consent of Landlord, which consent shall not be unreasonably withheld, except that adjustments in signage shall not require Landlord's consent.

     6.    **COVENANTS OF LANDLORD:** Landlord does hereby covenant and agree that it shall: (i) permit the Tenant, its agents, servants and employees access to the ATM and/or related Landlord's property (including building access when necessary) for the purposes of installation, maintenance, and servicing of the ATM; (ii) permit the Tenant, its agents, servants and employees to park motor vehicles on the Landlord's property in connection with the performance of Tenant's maintenance and repairs as permitted herein, subject to such limitations as may, from time to time, be required; (iii) provide normal cleaning around the ATM (including snow and ice removal during winter months) and maintain the area around the ATM in orderly fashion so that customers have convenient and safe access to the ATM; (iv) maintain all and provide utilities serving the Building and Premises (including, without limitation, sufficient electrical power and data service to the ATM); and (v) permit such inspections of the Premises as are necessary, including but not limited to, fire and electrical hazards, by authorized personnel; (vi) during the Term, not permit any other ATM or electronic device to be installed or operated in the building or on the property where the Premises are located, by any bank, savings and loan association, financial institution, securities or brokerage firm, or other enterprise offering any financial services or products offered by Tenant and (vii) if necessary, fully cooperate with Tenant to obtain approval of all public and governmental authorities as to all matters relating to zoning, building permit, special use permits or similar requirements for use of the Premises in accordance with Tenant's plans and specifications.

     7.    **DEFAULT**:

     a.  ***Tenant Default and Remedy***: If Tenant shall be in default in the performance of any covenant of this Lease and has not commenced to cure such default within thirty (30) days after notice thereof by Landlord, Landlord may terminate this Lease and resume possession of the Premises thereby wholly discharging Tenant from its obligations under this Lease.

     b.  ***Landlord Default and Remedy***: If any default by Landlord under the terms of this Lease shall continue for thirty (30) days after written notice thereof from Tenant without Landlord's having commenced to cure the same, Tenant may terminate this Lease.

     8.    **FIXTURES AND PERSONAL PROPERTY; SURRENDER:** Upon termination of this Lease, Tenant shall remove the ATM and Tenant's related property at the cost of Tenant. If Tenant fails to remove all or any of such property, Landlord may at Landlord's option retain all or any of such property and title thereto shall thereupon vest in Landlord, or Landlord may remove from the Premises and dispose of in any manner all or any of such property, in which latter event Tenant shall, upon demand, promptly pay to Landlord the actual expense of such removal and disposition and the cost of repair of any and all damage to the Premises resulting from or caused by such removal. Tenant shall remove all of the equipment including the ATM itself, overhead awning, bollards, cap off the electric and cover the opening with plywood.

**9.** **QUIET ENJOYMENT**: Landlord covenants that so long as Tenant fulfills the conditions and covenants required of it to be performed, Tenant will have peaceful and quiet possession of the Premises.

**10.** **ASSIGNABILITY**: Tenant may assign this Lease and Tenant's rights, interests, and obligations hereunder, without Landlord's consent, to (i) any entity controlled by, controlling or under common control of Tenant or (ii) to any entity that that succeeds to or acquires all or substantially all of the business of Tenant through merger, consolidation, acquisition of stock or assets, or other business combination.

**11.** **INDEMNIFICATION:** Each party agrees to defend, indemnify and hold harmless the other party, its employees, directors, officers, agents, successors and assigns, from and against any third party for any losses, damages, costs, expenses and liabilities, directly or indirectly arising out of or attributed to, or in connection with the negligence or willful misconduct of the indemnifying party, its agents or employees or arising out of such party's breach of this Lease.

**12.** **INSURANCE:** Tenant and Landlord each agree to carry comprehensive general liability insurance which shall insure against a combined loss of not less than One Million Dollars ($1,000,000.00) for each occurrence. Landlord agrees to carry all risk property insurance shall be in an amount not less than that required to replace one hundred percent (100%) of the improvements located on Landlord's property.

**13.** **EXCUSE FROM PERFORMANCE:** In the event of any judicial or other governmental determination that the ATM may not be operated in one or more mutually agreed locations covered by this Lease, this Lease shall be terminated with respect to such ATM, with no further liability of either party.

**14.** **CONDEMNATION**: If the whole or any part of the Premises shall be taken under the power of eminent domain, then this Lease shall terminate as to the part taken on the day when Tenant is required to yield possession thereof, and Landlord, to the extent of the condemnation award, shall make such repairs and alterations as may be necessary in order to restore the part not taken to useful condition. The Rent shall be reduced proportionately as to the part of the Premises taken, the reduction to be effective on the date that Tenant is required to yield possession. If the amount of the Premises so taken is such as to impair substantially the usefulness of the Premises for the purposes for which the same are hereby leased, then either party shall have the option to terminate this Lease as of the date when Tenant is required to yield possession.

**15.** **NOTICES:** Any notices under this Lease shall be personally delivered, delivered by the deposit thereof in the U.S. Postal Service, postage prepaid, registered, or certified, return receipt requested, or by reputable overnight courier service to the party at the address listed below or at another address hereafter designated by notice. Any such notice shall be deemed to have been delivered and given upon personal delivery or delivery by overnight courier service, or deposit with the United States Postal Service:

TENANT:                                                LANDLORD:

US2008 18695510 5

Fifth Third Bank
Fifth Third Center
38 Fountain Square Plaza
MD 10903K
Cincinnati, Ohio 45202
Attn: SVP Enterprise Workplace Services

c/o HeilizerLaw
5 N. Wabash Ave, Suite 1304
Chicago, Illinois 60602
Attention: Glenn E. Heilizer

And:
Fifth Third Bank
Fifth Third Center
38 Fountain Square Plaza
MD 10903K
Cincinnati, OH 45202
Attn:   ATM Administrator

### 16.   **MISCELLANEOUS:**

a.   ***Governing Law***:   The laws of the State of Illinois shall govern this Lease without reference to the choice-of-law provisions thereof.

b.   ***Entire Agreement:*** This Lease represents the entire agreement between the parties with respect to the subject matter hereto, and supersedes all other proposals, agreements, representations and covenants, oral or written.  Any modification of this Lease, unless otherwise indicated herein, must be in writing and signed by both parties.

c.   ***Provisions Binding:*** This Lease shall be binding upon and inure to the benefit of the respective successors or assigns of the parties to this Lease, except as otherwise prohibited by this Lease

d.   ***Invalid or Illegal Provisions:*** Any provision or provisions of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions hereof shall nevertheless remain in full force and effect.

e.   ***Captions of Paragraphs:*** The captions of the paragraphs in this Lease are for convenience only and shall not be considered or referred to in resolving questions of interpretation or construction.  The parties hereby agree that they have read and fully understand all terms, conditions and covenants contained within this Lease and enter this Lease freely, without reservation.  This Lease shall not be construed as if prepared by one of the parties, but rather according to its fair meaning as a whole, as if both parties had prepared it.

f.   ***Rights, Options, Election, Powers and Remedies:*** The various rights, options, elections, powers and remedies contained in this Lease shall be construed as cumulative and no one of them shall be exclusive of any of the others, or of any other legal or equitable remedy which either party might otherwise have in the event of breach or default in the terms hereof, and the exercise of one right or remedy by such party shall not impair its right to any other right or remedy until all obligations upon the other party have been fully performed.

g.   ***Time***: Time is of the essence with respect to the performance of each of the covenants and agreements under this Lease.

h.  **_Relationship of Landlord and Tenant:_** Nothing contained herein will be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of Rent, nor any other provision contained herein nor any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of lessor and lessee.

i.  **_Force Majeure_**: In the event Landlord shall be delayed or hindered in or prevented from the performance of any obligation required under this Lease by reason of strikes, lockouts, inability to procure labor or materials, failure of power, fire or other casualty, acts of God, restrictive governmental laws or regulations, riots, insurrection, terrorist acts, war, or any other reason not within the reasonable control of Landlord, then the performance of such obligation shall be excused for a period of such delay.

j.  **_Waiver of Jury Trial_**: Both parties hereby knowingly and voluntarily waive the right to a jury trial in any action, proceeding, or permissive counterclaim involving any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or any claim for injury or damage.

**[REMAINDER OF PAGE BLANK. SIGNATURE PAGES FOLLOW.]**

IN WITNESS WHEREOF, the parties have caused this Lease to be executed as of the date and year first above written.

TENANT:

**FIFTH THIRD BANK, NATIONAL ASSOCIATION,**
a federally chartered institution

By: _____
Name: _____
Title: _____
Date: _____

AND BY:

By: _____
Name: _____
Title: _____
Date: _____

LANDLORD:

**LOCKPORT REDEVELOPMENT LLC,**
an Illinois limited liability company

By: _Nagy M Nulilel_
Name: _FAIEZ DAHLEN_
Title: _MANAGER_
Date: _Sept 2, 2021_

**Exhibit A to ATM Lease Agreement**



# EXHIBIT B

## FIRST AMENDMENT TO
## REAL ESTATE PURCHASE AND SALE AGREEMENT

THIS FIRST AMENDMENT TO REAL ESTATE PURCHASE AND SALE AGREEMENT (this "Amendment") is made and effective as of the 4th day of October, 2021 by and between **FIFTH THIRD BANK, NATIONAL ASSOCIATION**, a federally chartered institution (the "Seller") and **LOCKPORT REDEVELOPMENT, LLC**, an Illinois limited liability company (the "Buyer").

### RECITALS

A.      Seller and Buyer entered into that certain Real Estate Purchase and Sale Agreement dated September 2, 2021 (the "Agreement") covering the terms for the purchase and sale of certain property located at 16732 W. 159th Street, Lockport, Illinois.

B.      The parties hereto desire to amend the Agreement as more particularly set forth hereinbelow.

NOW, THEREFORE, for and in consideration of the above premises, the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby acknowledge and agree as follows:

1.      Inspection Period.  Buyer and Seller hereby acknowledge and agree that the Inspection Period is hereby extended such that the Inspection Period shall expire on October 18, 2021.

2.      Miscellaneous.  Except as amended hereby, the Agreement remains unchanged and in full force and effect.  This Amendment is executed in connection with and is deemed to be a part of the Agreement.  Where the terms of the Agreement and the terms of this Amendment conflict, the terms of this Amendment shall govern.  Any capitalized terms not defined in this Amendment shall have the same meaning as set forth in the Agreement.  This Amendment may be executed by facsimile and/or by pdf and in two or more counterparts, each of which together shall be considered one instrument.

[REMAINDER OF PAGE BLANK.  SIGNATURE PAGE FOLLOWS.]

EXHIBIT B

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto and is effective as of the date set forth above.

SELLER:

**FIFTH THIRD BANK, NATIONAL ASSOCIATION**, a federally chartered institution

By: _____
Name: DeAnn Leonard
Its: VP-Real Estate Manager

**FIFTH THIRD BANK, NATIONAL ASSOCIATION**, a federally chartered institution

By: _____
Name: Randall L. Morrissey
Its: VP-Real Estate Manager

BUYER:

**LOCKPORT REDEVELOPMENT, LLC**, an Illinois limited liability company

By: _____
Name: Lockport Redevelopment LLC
Its: Manager

US2008 19047008 1

# EXHIBIT C



EXHIBIT C